1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSE ARIAS GARCIA,**<br><br>Petitioner,<br><br>**v.**<br><br><br>**CONNIE GIBSON,**<br><br>Respondent. | **Case No. 1:12-cv-01748 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Leanne L. LeMon of the office of the California Attorney General.

**I.      PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on December 18, 2009, of multiple convictions for lewd acts on a child and sodomy with a child 10 years or younger. (Clerk's Tr. at 460-465.) On January 28, 2010, Petitioner was sentenced to an indeterminate term of 275 years to life in state prison. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

1

1 District on October 26, 2010. (Lodged Doc. 7.) The appeal was denied on September 7,

2 2011. (Answer, Ex. A.) On October 17, 2011, Petitioner filed a petition for review with the

3 California Supreme Court. (Lodged Doc. 10.) The petition was summarily denied on

4 November 16, 2011. (Lodged Doc. 11.)

5      On April 2, 2012, Petitioner filed a petition for writ of habeas corpus with the

6 Supreme Court of California. (Lodged Doc. 12.) The petition was denied on June 20,

7 2012. (Lodged Doc. 13.)

8      Petitioner filed his federal habeas petition on October 15, 2012. (Pet., ECF No. 1.)

9 The petition raised three different claims for relief, listed as follows:

10      1.) The jury was improperly instructed with CALCRIM No. 362;

11      2.) Petitioner's sentence constitutes cruel and unusual punishment as he was

12      convicted without any DNA or physical evidence; and

13      3.) Ineffective assistance of counsel based on counsel's failure to raise a cruel

14      and unusual punishment defense at sentencing.

15 (Pet. at 5-8, ECF No. 1.)

16      Respondent filed an answer to the petition on January 8, 2013. (Answer, ECF No.

17 21.) Petitioner filed a response to the answer on January 22, 2013. (ECF No. 23.) The

18 matter stands ready for adjudication.

19 **II.**   **STATEMENT OF THE FACTS[1]**

20      **INTRODUCTION**

21        In this extremely sad and disturbing case, appellant/defendant Jose
Arias Garcia (defendant) was charged and convicted of 29 felony counts

22 for repeatedly raping, sodomizing, and committing lewd acts against his
two young daughters, E.G. and A.G. The jury also found true special

23 allegations that defendant engaged in substantial sexual conduct with the
victims and he committed the offenses against multiple victims. Defendant

24 was sentenced pursuant to the one strike law (Pen. Code,**[FN1]** § 667.61)
to a total indeterminate term of 275 years to life plus 12 years.

25

26      **FN1**: All further statutory citations are to the Penal Code unless otherwise

27 [1]The Fifth District Court of Appeal's summary of the facts in its September 7, 2011 opinion is presumed
correct.  28 U.S.C. § 2254(e)(1).

28

2

indicated.

On appeal, defendant contends the jury was improperly instructed with CALCRIM No. 362, consciousness of guilt. Defendant also contends there is insufficient evidence to support two counts of unlawful sexual intercourse committed against A.G. Defendant challenges the calculation of his indeterminate sentence, and argues it constitutes cruel and/or unusual punishment in violation of the federal and state constitutions.

We will correct defendant's sentence, and otherwise affirm.

## FACTS

Defendant (born 1972) and Christina A. are the parents of three children: E.G. (born 1994), J.G. (one year younger than E.G.), and A.G. (born 1999).**[FN2]** Defendant and Christina were married for 13 years and divorced in 2006.

**FN2**: At trial, Christina testified defendant was the natural father of her three children. Also at trial, the prosecutor asked E.G. if defendant was her biological father or stepfather. E.G. replied: "My mom said he's my biological dad, but I don't know ...."

Defendant was convicted of 29 counts for sexually molesting E.G. and A.G. when the family lived in Dinuba, Tulare, and Sultana. The molestations continued after defendant and Christina were divorced, and even after E.G. told Christina that defendant was inappropriately touching her. As the trial court noted, "to say [defendant's] conduct in this matter was particularly heinous is a wholly inadequate summary of what [he] did."

We will review the evidence and convictions in sequential order based on the children's descriptions of when and where defendant molested them.

## DEFENDANT'S MOLESTATION OF E.G. COUNTS 23 - 29

E.G. was 15 years old and a sophomore in high school when she testified at trial. E.G. testified defendant molested her when they lived in Dinuba, Tulare, and Sultana.

Dinuba

E.G. testified that defendant started to inappropriately touch her when she was in second grade and the family lived in Dinuba. One night, she was lying down in her bedroom when defendant appeared and said his hands were cold. Defendant rubbed his hands between her legs, put his hands under her clothing, and penetrated her vagina. E.G. told him it hurt and defendant stopped. Defendant asked if she liked it but she did not respond.

E.G. described another incident that occurred in Dinuba. She was in her parents' bedroom and her mother was in the bathroom. Defendant grabbed E.G. and put her on top of him. Defendant held her body against him, and he made her move up and down. She tried to get away but defendant pulled her back.

E.G. told her mother about the incidents when they lived in Dinuba, but her mother did not do anything.

Based on the molestations defendant committed against E.G. in Dinuba, he was charged and convicted of counts 28 and 29, commission of lewd acts on a child under the age of 14 years old (§ 288, subd. (a)). The jury found true the special allegations as to counts 28 and 29, that defendant had substantial sexual conduct with a victim under the age of 14 years (§ 1203.066, subd. (a)(8)), and as to count 29, that there were multiple victims within the meaning of the one strike law (§ 667.61, subd. (b)).**[FN3]**

**FN3**: The information, jury instructions, and verdict forms for counts 1 through 29 specifically alleged that particular charges were based on particular acts described by the children. We will refer generally to defendant's convictions except as to the convictions implicated by defendant's substantial evidence arguments in issue II, post.

Tulare

E.G. testified that the family lived in their car in Tulare for awhile. One night, while family members were asleep, defendant draped his arm between the two front seats and into the back seat, and placed his fingers in her vagina. Defendant appeared asleep and she moved his hand away from her.

E.G. testified the family lived with her aunt in Tulare when she was in the fifth grade. On another night, while E.G. was half asleep on the floor, defendant put lotion on his hands and inappropriately touched her. E.G. walked out of the room, woke up her mother, and said that defendant touched her private part. Christina started to cry and yell at defendant. Defendant told Christina that he was sorry. At trial, Christina admitted that E.G. told her that defendant touched her that night.

E.G. testified defendant continued to stay with the family after the incident at her aunt's house. The family lived in a house on G Street in Tulare from 2005 to the summer of 2006. When E.G. was in sixth grade, she was watching television at the G Street house with her brother while their mother was at work. Her brother was asleep, and defendant sat next to her on the sofa. Defendant told her to use a condom if she did anything with anyone. Defendant instructed her on the use of a condom, put one on himself, and made her hold it. She started to cry, and defendant told her not to tell anyone.

E.G. described other occasions in which he engaged in substantial sexual conduct. One occurred in the kitchen when defendant grabbed her from behind and inappropriately rubbed up against her. Two other incidents took place while she was sick and in bed—one involving exposure to bodily fluids from defendant, and the other involving his effort to lie down beside her in bed.

Based on the molestations defendant committed against E.G. in Tulare, he was charged and convicted of counts 23, 24, 25, 26, and 27, commission of lewd acts on a child under the age of 14 years (§ 288, subd. (a)). The jury found true the special allegations as to counts 24, 26, and 27, that defendant had substantial sexual conduct with a victim under

4

the age of 14 years (§ 1203.066, subd. (a)(8)); and as to counts 24 and 25, that there were multiple victims (§ 667.61, subd. (b)).

Sultana

E.G. testified the family moved to Sultana when she was 13 years old and in the seventh grade. She slept in bunk beds with her sister. One night when E.G. was in the bottom bunk, she woke up and realized her hand was on defendant's penis. Defendant held her wrist, and moved her hand for his own arousal. Defendant told E.G. that he would hit her if she told her mother.

**DEFENDANT'S MOLESTATION OF A.G. COUNTS 1 - 22**

A.G. was 10 years old and in the fifth grade when she testified at trial. A.G. testified defendant molested her when they lived in Tulare and Sultana.

Tulare

A.G. testified defendant molested her for the first time when the family lived in Tulare. A.G. was seven years old and in the first or second grade. She was sleeping on the sofa and had forgotten to wear a "pull-up" diaper. Defendant sat next to her on the sofa and put the diaper on her, and then rubbed her private parts and inappropriately caressed her.

A.G.'s brother was asleep in the same room, and defendant stopped touching her when her brother started to wake up. Defendant told A.G., "Don't tell your mom." She testified this was the only molestation incident that occurred when the family lived in Tulare.

Based on the molestations defendant committed against A.G. in Tulare, he was charged and convicted of counts 19, 20, 21, and 22, commission of lewd acts on a child under the age of 14 years (§ 288, subd. (a)). The jury also found true special allegations as to count 21, that defendant had substantial sexual conduct with a victim under the age of 14 years (§ 288, subd. (a)), and as to counts 21 and 22, that there were multiple victims (§ 667.61, subd. (b)).

Sultana Living Room

A.G. testified the next molestation incidents occurred when the family lived in a house in Sultana. She regularly arrived home from school an hour before her brother and sister, while her mother was at work and defendant was home alone. A.G. would sit on the living room floor and watch television with defendant. A.G. testified that defendant inappropriately touched her almost every day after she came home from school, when they sat in the living room and watched television.

The first incident occurred when A.G. walked into the living room to watch television and discovered that defendant had spread out blankets on the floor. He told her to lie down with him and watch television. Defendant lowered his pants, and touched and rubbed her private parts. Defendant then penetrated her with his finger, and A.G. said it hurt. Defendant went under her shirt and started to inappropriately caress her chest.

A.G. testified that for the next three days, defendant touched her in the same way when they sat on the living room floor after school.

A.G. testified that about one week after the first touching incident in the living room, she arrived home from school and defendant again had blankets on the living room floor. Defendant told her to get on the floor with him. She did not run away because she knew he would grab her. A.G. testified defendant sodomized her in the living room almost every day. Defendant asked her if she liked it, and A.G. said it hurt.

A.G. testified that on a different occasion, she was on the blankets on the living room floor. Defendant put her hand on his penis and made her move her hand to arouse him. Defendant asked if she liked it and she said, "No." This incident was the only time he made her touch him there.

A.G. testified that defendant also had sexual intercourse with her on the living room floor on more than one occasion. Defendant told her to lay on her side. He faced her and placed his penis in her vagina. A.G. testified it hurt.

A.G. testified that on one particular occasion, defendant had sexual intercourse and sodomized her on the same day.

A.G. also described other incidents when defendant engaged in substantial sexual conduct with her, including sexual intercourse.

A.G. testified that when defendant molested her in the living room, he always asked if she liked it, and he always told her not to tell her mother.

A.G. recalled an incident which occurred when defendant was in the garage and she was playing outside. Defendant told her to go into the house with him. Defendant opened his pants and told her to sit on his lap.

Based on the molestations defendant committed against A.G. in the Sultana living room, he was charged and convicted of counts 1 and 3, sodomy with a child who was 10 years old and younger (§ 288.7, subd. (a)); counts 2, 4, 6, 8, 9, and 10, commission of lewd acts on a child under the age of 14 years old (§ 288, subd. (a)); and counts 5 and 7, sexual intercourse with a child who was 10 years old and younger (§ 288.7, subd. (a)). The jury found true special allegations as to counts 2, 4, 6, 8, 9, and 10, that defendant had substantial sexual conduct with a victim under the age of 14 years (§ 1203.66, subd. (a)(8)); and as to count 9, that there were multiple victims (§ 667.61, subd. (b)).

Sultana Bedroom

Prior to trial, A.G. gave a videotaped interview with a member of the Child Abuse Response Team (CART). During that interview, A.G. said defendant molested her at night in her bedroom in Sultana: he sodomized her more than one time, and he placed his penis in her vagina more than one time.**[FN4]**

**FN4**: A.G.'s videotaped interview was introduced into evidence.

6

At trial, A.G. testified that she slept in the Sultana bedroom with her sister. They had bunk beds but A.G. occasionally slept on the floor. One night, A.G. was sleeping on the floor, and defendant came into the room and lay on the floor with her. Defendant pulled down her pants, put his hands on her waist, and sodomized her. A.G. testified this kind of incident happened more than once.

Also at trial, A.G. testified about another incident that happened in the bedroom. She was again sleeping on the floor, defendant lay next to her, and he put his penis in her vagina. She testified that defendant placed his penis in her vagina "one time" in her bedroom, and it was "the last time he went into my bedroom and did that to me. That's the only time he did that."**[FN5]**

**FN5**: As we will discuss in issue II, post, defendant contends there is insufficient evidence to support his convictions for the committing more than one act of sexual intercourse against A.G. in the Sultana bedroom.

A.G. testified about another incident in her bedroom, when she was sleeping in the top bunk bed and her sister was on the bottom bunk. A.G. woke up because the bed was moving, and she heard defendant ask, " 'Do you like it[?]' " A.G. realized defendant was doing something to E.G., and A.G. made noise so defendant would realize she was awake and stop.

A.G. testified she never told her mother that defendant was molesting her because defendant was a "mean person" who hits "very hard." Defendant had hit her mother and A.G., and A.G. was scared of him.

Based on the molestations defendant committed against A.G. in the Sultana bedroom, he was charged and convicted of counts 11 and 13, sodomy with a child who was 10 years old and younger (§ 288.7, subd. (a)); counts 12, 14, 16, and 18, commission of lewd acts on a child under the age of 14 years old (§ 288, subd. (a)); and counts 15 and 17, sexual intercourse with a child who was 10 years old and younger (§ 288.7, subd. (a)). The jury found true special allegations as to counts 12, 14, 16, and 18, that defendant had substantial sexual conduct with a victim under the age of 14 years (§ 1203.066, subd. (a)(8)).**[FN6]**

**FN6**: The clerk's transcript states that as to counts 12 and 14, the jury found the multiple victim allegations true. However, the reporter's transcript and the verdict forms state the jury found the multiple victim allegations not true.

**ADDITIONAL PROSECUTION EVIDENCE**

At trial, Christina admitted that E.G. told her that defendant inappropriately touched her when they were living with the aunt in Tulare. Defendant told Christina that he was sorry. Christina divorced defendant in 2006, and she and the children were living in Tulare when her divorce from defendant became final. However, defendant kept staying with them, and he would "come and go" from their homes in Tulare and Sultana. Christina admitted he had keys to the homes. Christina got a job, and she let defendant stay alone with A.G. after school, even though E.G. had

already told her that defendant had touched E.G. inappropriately. Christina trusted defendant because he was the children's father.

While they were living in Sultana, A.G. revealed to E.G. that defendant had touched her in a "weird" way. E.G. told A.G. to tell their mother, and A.G. finally did so. After A.G. told Christina, E.G. again revealed that defendant had also molested her. However, Christina did not say anything or call the police. E.G. did not call the police herself because she did not think anyone would believe her since her mother did not believe her.

At trial, Christina admitted that her daughters had told her that defendant was molesting them, but she did not call the police because she could not take what was happening.

E.G. testified that during the same time period, defendant had been hitting Christina and there was "a lot of drama going on." As a result, E.G. was seeing a therapist through child services. E.G. finally told her own therapist about the molestations, and the therapist called the police.

Defendant moved out of the Sultana house when E.G. was in seventh grade and A.G. was in third grade.

Defendant's postarrest statement

On July 23, 2009, defendant was arrested. He was advised of the warnings pursuant to <u>Miranda v. Arizona</u> (1966) 384 U.S. 436, and he waived his rights and agreed to answer questions. Defendant's videotaped interview was introduced into evidence.**[FN7]**

**FN7**: Defendant filed a pretrial motion to exclude his statement and argued it was involuntary and that he was under the influence of narcotics at the time he gave the statement. The court denied the motion, and defendant has not challenged the admissibility of his statement on appeal.

Defendant said he was homeless and living at the rescue mission. He said he used drugs, and crystal methamphetamine had caused problems in his life. He was embarrassed because he could not provide for his children. Defendant said he had not seen the children for a long time.

Defendant said crystal methamphetamine made him "start doing things." He admitted he touched A.G. Defendant said he regretted everything and asked for forgiveness, because he touched his daughter and behaved badly with his wife and children. Defendant initially claimed he only touched A.G. three times. He admitted he touched A.G.'s chest, body, and private areas, but denied having a sexual relationship with her.

Upon further questioning, defendant said he kissed A.G.'s chest and neck, and he touched between her legs. The officer asked defendant if he had sexual relations with A.G., and defendant replied: "I am responsible for everything." Defendant said he felt bad because he knew he hurt the children, and he was sorry that he touched A.G.'s private parts. The officer asked defendant if he wanted to ask A.G. for forgiveness for having sex with her, and defendant said: "For everything."

8

**DEFENSE CASE**

Defendant did not testify. A defense investigator testified he tried to interview Christina and the children, but Christina refused to cooperate.

In closing argument, defense counsel argued the jury should find defendant not guilty of all the charges. Defense counsel asserted there was no evidence the children suffered any physical injuries from the alleged molestations, and that the children had a motive to lie about the alleged molestations because defendant had beat them and their mother. Defense counsel further argued that defendant was pressured to make his postarrest admissions because he was worn down by drug use and living on the street.

**CONVICTIONS AND SENTENCES**

As explained ante, defendant was convicted of the 29 charged offenses. The jury found true special allegations that multiple victims were involved, pursuant to the one strike law, and that defendant had engaged in substantial sexual conduct with the minor victims.

At the sentencing hearing, the court imposed an aggregate determinate term of 12 years plus 275 years to life. As to the 12-year determinate term, the court imposed principal and subordinate terms, both consecutive and concurrent, for counts 23, 26, 27, 28, 10, 19, and 20.

The court imposed an aggregate indeterminate term of 275 years to life based on the one strike law as follows: as to counts 1, 3, 5, 7, 11, 13, 15, and 17, consecutive terms of 25 years to life; and as to counts 9, 21, 24, 25, and 29, consecutive terms of 15 years to life. As to count 22, the court imposed a concurrent term of 15 years to life. As to counts 2, 4, 6, 8, 12, 14, 16, and 18, the court imposed midterms of six years for each count, stayed pursuant to section 654.

People v. Garcia, 2011 Cal. App. Unpub. LEXIS 6818, 1-17 (Cal. App. 5th Dist. Sept. 7, 2011).

## II.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

1

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.    Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under §

1  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

2  (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-

3  71 (2003). A state court decision will involve an "unreasonable application of" federal

4  law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at

5  409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

6  Court further stresses that "an *unreasonable* application of federal law is different from

7  an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529

8  U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks

9  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

10 correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541

11 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

12 have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

13 Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

14 Federal law for a state court to decline to apply a specific legal rule that has not been

15 squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

16 (2009), quoted by Richter, 131 S. Ct. at 786.

17                    2.    Review of State Decisions

18       "Where there has been one reasoned state judgment rejecting a federal claim,

19 later unexplained orders upholding that judgment or rejecting the claim rest on the same

20 grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the

21 "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

22 (9th Cir. 2006). Determining whether a state court's decision resulted from an

23 unreasonable legal or factual conclusion, "does not require that there be an opinion from

24 the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

25 "Where a state court's decision is unaccompanied by an explanation, the habeas

26 petitioner's burden still must be met by showing there was no reasonable basis for the

27 state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

28 not require a state court to give reasons before its decision can be deemed to have been

1    'adjudicated on the merits.'").

2        <u>Richter</u> instructs that whether the state court decision is reasoned and explained,

3    or merely a summary denial, the approach to evaluating unreasonableness under §

4    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

5    or theories supported or, as here, could have supported, the state court's decision; then

6    it must ask whether it is possible fairminded jurists could disagree that those arguments

7    or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786.

8    Thus, "even a strong case for relief does not mean the state court's contrary conclusion

9    was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75).  AEDPA "preserves

10   authority to issue the writ in cases where there is no possibility fairminded jurists could

11   disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u>  To put

12   it yet another way:

13            As a condition for obtaining habeas corpus relief from a federal
         court, a state prisoner must show that the state court's ruling on the claim
14       being presented in federal court was so lacking in justification that there
         was an error well understood and comprehended in existing law beyond
15       any possibility for fairminded disagreement.

16   <u>Id.</u> at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

17   are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at

18   787. It follows from this consideration that § 2254(d) "complements the exhaustion

19   requirement and the doctrine of procedural bar to ensure that state proceedings are the

20   central process, not just a preliminary step for later federal habeas proceedings." <u>Id.</u>

21   (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977).

22            3.    <u>Prejudicial Impact of Constitutional Error</u>

23        The prejudicial impact of any constitutional error is assessed by asking whether

24   the error had "a substantial and injurious effect or influence in determining the jury's

25   verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551

26   U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the

27   state court recognized the error and reviewed it for harmlessness).  Some constitutional

28   errors, however, do not require that the petitioner demonstrate prejudice.  <u>See</u> <u>Arizona v.</u>

1   <u>Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659

2   (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

3   assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the

4   <u>Strickland</u> prejudice standard is applied and courts do not engage in a separate analysis

5   applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918, n. 7 (2002).  <u>Musalin</u>

6   <u>v. Lamarque</u>, 555 F.3d at 834.

7   **III.    REVIEW OF PETITION**

8       **A.    Claim One: CALCRIM No. 362**

9       In his first claim, Petitioner contends that the state court's use of the jury

10   instruction CALCRIM No. 362 created an unconstitutional presumption that Petitioner

11   was aware of his guilt, thereby violating his right to a fair trial.

12       1.    State Court Decision

13       Petitioner presented this claim by way of direct appeal to the California Court of

14   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

15   appellate court and summarily denied in subsequent petition for review by the California

16   Supreme Court. (<u>See</u> Lodged Doc. 7, Answer, Ex. A.[1]) Because the California Supreme

17   Court's opinion is summary in nature, this Court "looks through" that decision and

18   presumes it adopted the reasoning of the California Court of Appeal, the last state court

19   to have issued a reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3

20   (1991) (establishing, on habeas review, "look through" presumption that higher court

21   agrees with lower court's reasoning where former affirms latter without discussion); <u>see</u>

22   <u>also</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts

23   look to last reasoned state court opinion in determining whether state court's rejection of

24   petitioner's claims was contrary to or an unreasonable application of federal law under

25   28 U.S.C. § 2254(d)(1)).

26              [1] Petitioner again raised the claim in his state habeas corpus petition. (<u>See</u> Lodged Docs. 12-13.)
27   The petition was summarily denied. Accordingly, the Court shall address the reasoning presented by the
appellate court in the direct appeal to assist in determining if the state court was unreasonable in denying
28   the claim in either the direct appeal or in the habeas corpus petition.

In denying Petitioner's claim, the California Court of Appeal explained:

**I.     CALCRIM No. 362**

Defendant challenges the language of CALCRIM No. 362 and contends it reduces the prosecution's burden of proving the charged offenses beyond a reasonable doubt. As given to the jury in this case, CALCRIM No. 362 states:

"If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show that *he was aware of his guilt of the crime*, and you may consider it in determining his guilt.

"If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (Italics added.)

As defendant acknowledges, CALCRIM No. 362 is the successor to CALJIC No. 2.03, which provided that if the jury found defendant made a willfully false or misleading statement, it could be considered as "'a circumstance tending to prove *consciousness of guilt*.'" (People v. McGowan (2008) 160 Cal.App.4th 1099, 1103 (McGowan), italics added.) "The California Supreme Court has consistently upheld CALJIC No. 2.03 against various and sundry attacks," and specifically found the instruction did not lessen the prosecution's burden of proof. (Id. at p. 1104, fn. 3; People v. Benavides (2005) 35 Cal.4th 69, 100; see also People v. Page (2008) 44 Cal.4th 1, 49-50; People v. McWhorter (2009) 47 Cal.4th 318, 377.) "Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 ..., none is sufficient to undermine our Supreme Court's approval of the language of these instructions." (McGowan, supra, 160 Cal.App.4th at p. 1104; cf. People v. Beyah (2009) 170 Cal.App.4th 1241, 1251.)

Despite these holdings, defendant asserts there is an important difference between CALJIC No. 2.03 and CALCRIM No. 362, which renders the latter instruction unconstitutional. Defendant points to CALCRIM No. 362's language that if the jury finds a defendant made a false or misleading statement, "that conduct may show that he was *aware of his guilt* of the crime ...." (Italics added.) Defendant argues CALCRIM No. 362's use of the phrase "aware of his guilt" is far more prejudicial than CALJIC No. 2.03's language that the jury could find that such statements may show the defendant's "consciousness of guilt."

This court has previously considered and rejected the identical argument about the use of the phrase "aware of his guilt" in a similar instruction. In People v. Hernandez-Rios (2007) 151 Cal.App.4th 1154 (Rios), the defendant argued CALCRIM No. 372, flight after crime, contained language that reduced the prosecution's burden of proof, based on CALCRIM No. 372's language that if a defendant fled immediately after a crime, "'that conduct may show that he was *aware of his guilt*.'" (Rios, supra, 151 Cal.App.4th at p. 1158, italics in original.) This court noted that the California Supreme Court had addressed similar challenges to CALJIC

1

No. 2.52, the predecessor to CALCRIM No. 372, and rejected arguments that CALJIC No. 2.52's use of the phrase "'consciousness of guilt'" reduced the prosecution's burden of proof. (<u>Rios</u>, supra, 151 Cal.App.4th at p. 1158, citing <u>People v. Mendoza</u> (2000) 24 Cal.4th 130, 179-180; <u>People v. Navarette</u> (2003) 30 Cal.4th 458, 502.) <u>Rios</u> concluded that "[b]y parity of reasoning to both <u>Mendoza</u> and <u>Navarette</u>," CALCRIM No. 372's use of the phrase "aware of guilt" did not "impermissibly presume[] the existence of his guilt and lower[] the prosecution's burden of proof." (<u>Rios</u>, supra, 151 Cal.App.4th at p. 1159.)

2

3

4

5

6

Defendant acknowledges this court's holding in <u>Rios</u> but urges us to reconsider it. We decline to do so and reject defendant's challenge to CALCRIM No. 362.

7

<u>People v. Garcia</u>, 2011 Cal. App. Unpub. LEXIS 6818, 17-20 (Cal. App. 5th Dist. Sept. 7, 2011).

8

9

2.      Analysis

10

Habeas relief based on an erroneous jury instruction may be granted only if the

11

challenged instruction "so infected the entire trial that the resulting conviction violates

12

due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385

13

(1991) (internal quotation marks and citation omitted). The challenged instruction "must

14

be considered in the context of the instructions as a whole and the trial record" and not

15

viewed in isolation. <u>Id.</u> Petitioner is not entitled to habeas relief unless the error at issue

16

"had substantial and injurious effect or influence in determining the jury's verdict"; that is,

17

Petitioner must establish that the error "resulted in actual prejudice." <u>Brecht v.</u>

18

<u>Abrahamson</u>, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (internal

19

quotation marks and citations omitted).

20

Several federal courts in California have rejected similar claims that CALCRIM

21

No. 362 was "constitutionally infirm." Such denials were based on the following

22

reasoning:

23

24

25

26

27

28

Petitioner also contends that by giving [CALCRIM No. 362] the trial court implied that he had made up a story and that the jury should therefore find him guilty. ([citation omitted]). Contrary to Petitioner's claim, consciousness of guilt is not an inherent conclusion to be drawn from the instruction. The instruction explicitly predicates the first two sentences, relating to whether a defendant made a false or misleading statement in the first instance, with "If," and leaves the ultimate resolution of the significance of such statements to the jury. The final sentence also cautions that such statements alone cannot establish culpability. Therefore, that Petitioner's statements were willfully false or misleading is not an inherent inference of the instruction itself, and CALCRIM No. 362 is

1
2
3

> not constitutionally infirm. See [United States v. Perkins, 937 F.2d 1397, 1401-02 & n.2 (1991)] (upholding a similar instruction because it did not state that false exculpatory statements constitute evidence of guilt, but merely that the jury may consider them as indicating a consciousness of guilt).

Eatmon v. Yates, Case No. C09-0079 JSW, 2011 U.S. Dist. LEXIS 37539, 2011 WL
4
5
1157288, at *7 (N.D. Cal. Mar. 29, 2011); see also Butts v. Cate, 2012 U.S. Dist. LEXIS
6
53228 (N.D. Cal. Apr. 16, 2012). This Court agrees and finds that CALCRIM No. 362 did
7
not create impermissible inferences that prejudiced Petitioner. Accordingly, the state
8
court's denial of Petitioner's claim was neither contrary to nor an unreasonable
9
application of clearly established federal law. Petitioner is not entitled to habeas corpus
10
relief.

11
### B.   Claim Two: Cruel and Unusual Punishment
12
In his second claim, Petitioner asserts that his sentence constitutes cruel and
13
unusual punishment under the Eighth Amendment of the Constitution as there was not
14
sufficient evidence of his guilt and that it was grossly disproportionate to the crime. (Pet.
15
at 17.)

16
### 1.   State Decision
17
In the last reasoned decision denying Petitioner's claim, the appellate court
18
explained:

19
### IV.   Cruel and/or unusual punishment
20
> Aside from the sentencing issues addressed in issues II and III, ante, defendant contends the imposition of the lengthy aggregate indeterminate term for his convictions in this case, based on section 667.61, the one strike law, constitutes cruel and/or unusual punishment in violation of the Eighth Amendment of the federal constitution and Article I, section 17 of the California Constitution.

21
22

23
> "A punishment is excessive under the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the severity of the crime.' [Citation .] A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] [¶] In determining whether a particular punishment is cruel and/or unusual, courts examine the nature of the particular offense and offender, the penalty imposed in the same jurisdiction for other offenses, and the punishment imposed in other jurisdictions for the same offense. [Citations.]" (People v. Alvarado (2001) 87 Cal.App.4th 178, 199
24
25
26
27
28

1

(Alvarado); see Lockyer v. Andrade (2003) 538 U.S. 63, 70-77; Ewing v. California (2003) 538 U.S. 11, 20-31; Harmelin v. Michigan (1991) 501 U.S. 957, 961-962 [plur. opn. of Scalia, J.], 996-997, 1001 [conc. opn. of Kennedy, J.]; In re Lynch (1972) 8 Cal.3d 410, 424, 425-427.) The burden of demonstrating such disproportionality, which occurs "with exquisite rarity in the case law," rests with the defendant. (People v. Weddle (1991) 1 Cal.App.4th 1190, 1196-1197.)

2

3

4

"Section 667.61 mandates indeterminate sentences of 15 or 25 years to life for specified sex offenses that are committed under one or more 'aggravating circumstances,' such as when the perpetrator kidnaps the victim, commits the sex offense during a burglary, inflicts great bodily injury, uses a deadly weapon, sexually victimizes more than one person, ties or binds the victim, or administers a controlled substance to the victim. [Citations.] The purpose of the One Strike law is 'to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of elevated vulnerability." [Citation.]' [Citation.]" (Alvarado, supra, 178 Cal.App.4th at p. 186.)

5

6

7

8

9

10

Defendant concedes his challenges to the imposition of lengthy indeterminate terms pursuant to the one strike law have been rejected by other courts. (See, e.g., Alvarado, supra, 87 Cal.App.4th 178, 199-201; People v. Estrada (1997) 57 Cal.App.4th 1270, 1277-1282; People v. Crooks (1997) 55 Cal.App.4th 797, 803-809.) Nevertheless, defendant asserts these cases were wrongly decided. We agree with the holdings in these cases and reject defendant's constitutional challenge to the imposition of the indeterminate terms under the one strike law.

11

12

13

14

Defendant further argues his aggregate sentence is unconstitutional based on the nature and circumstances of this case. Defendant states that he was 36 years old when he was arrested, he was homeless and living on the streets, he admitted extensive use of crystal methamphetamine which purportedly turned him into a "'zombie,'" he expressed deep shame and remorse for his conduct, and he attributed his conduct to his long-standing drug and alcohol problems. Defendant concedes his offenses were "certainly serious and reprehensible," but the nature of his crimes "do not warrant the draconian punishment" imposed in this case because he did not use a weapon or brutalize the victims, and there is no evidence the victims suffered physical injuries "beyond those inherent in the sexual acts themselves."

15

16

17

18

19

20

21

We reject defendant's arguments and agree with the statements made by the trial court at the sentencing hearing in this case:

22

"[T]o say that your conduct in this matter was particularly heinous is a wholly inadequate summary of what you did, and yet, it says everything about what you did.

23

24

"As a father, ...you occupied a position of substantial trust, as well as authority and dominance over the victims in this matter.

25

26

"They were particularly vulnerable as a result of this situation.

27

28

1
2
3
4

> "These crimes that you have been convicted of, each of them, was separate and apart from each other. You had more than enough time to reflect upon the gravity and wrongfulness of your conduct, and ... [this case] cries out for consecutive sentence — sentences under the Rules of Court and the sentencing considerations that apply to these particular crimes.

5
6

> "I'm not going to say anything else. I am at a loss for additional words, a loss by disgust and sympathy for the victims in this matter."

7
8

> E.G. addressed her father at the sentencing hearing. She said that she had suffered a nervous breakdown, had received treatment at a mental hospital, and she still could not sleep well at night "because I feel like he's still there watching me sleep."

9
10
11
12

> The court further observed that defendant was not an appropriate candidate for probation "given the psychological and physical pain that you have inflicted on your children ...." The court also stated: "[W]hile the law suggests that you may be placed on parole, as a matter of reality, I see no way that you would ever be placed on parole or should you be. The pain that you have inflicted on your daughters is indescribable ...."

13
14

> For similar reasons, we conclude the sentence imposed in this case does not constitute cruel and/or unusual punishment under either the federal or state constitution.

15

People v. Garcia, 2011 Cal. App. Unpub. LEXIS 6818, 20-34 (Cal. App. 5th Dist. Sept. 7, 2011).

16

    2.    Analysis

17    The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor

18   excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.

19   amend. VIII; Norris v. Morgan, 622 F.3d 1276, 1285 (9th Cir. 2010). In noncapital cases

20   where the Eighth Amendment challenge is to the length of a sentence, the United States

21   Supreme Court has interpreted "cruel and unusual punishments" to mean sentences that

22   are "'grossly disproportionate" to the crime. Norris, 622 F.3d at 1285; Ewing v. California,

23   538 U.S. 11, 23, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003); Harmelin v. Michigan, 501

24   U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J., joined by

25   O'Connor and Souter, JJ., concurring); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct.

26   1166, 155 L. Ed. 2d 144 (2003) ("Through this thicket of Eighth Amendment

27   jurisprudence, one governing legal principle emerges as "clearly established" under §

28   2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of

1  years."). Although the precise contours of this principle are unclear because there has

2  been a "lack of clarity regarding what factors may indicate gross disproportionality,"

3  Andrade, 538 U.S. at 72-73, what is clear is that the gross disproportionality principle is

4  applicable only in the "exceedingly rare" and "extreme" case. Id. at 73; Harmelin, 501

5  U.S. at 1001; Solem v. Helm, 463 U.S. 277, 289-90, 103 S. Ct. 3001, 77 L. Ed. 2d 637

6  (1983).

7      In Norris, a panel of the Ninth Circuit observed that the "gross disproportionality

8  principle necessarily has a core of clearly established meaning," and held that "in

9  applying [the] gross disproportionality principle courts must objectively measure the

10  severity of a defendant's sentence in light of the crimes he committed." Norris, 622 F.3d

11  at 1287; see also Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004) (while  Supreme

12  Court precedent is the only authority that is controlling under the AEDPA, Ninth Circuit

13  case law may provide persuasive authority).

14      Here, the severity of Petitioner's sentence was not grossly disproportionate to the

15  crimes he committed. As the state court of appeal correctly found, Petitioner's "conduct

16  in this matter was particularly heinous" and that due to the "indescribable" pain he

17  inflicted on his daughters, that there was "no way that you would ever be placed on

18  parole or should you be." See Norris, 622 F.3d at 1292 (to determine the gravity of an

19  offense, courts must look beyond the label of the crime to examine the "factual specifics"

20  of the offense). As a result, his sentence of 275 years to life does not qualify as one of

21  those "exceedingly rare" or "extreme" cases that would entitle him to federal habeas

22  relief on the basis that it is cruel and unusual. See, e.g., Harmelin, 501 U.S. at 961-1009

23  (mandatory term of life in prison without the possibility of parole for first-time offender

24  possessing 672 grams of cocaine was not cruel and unusual punishment); see also

25  Kennedy v. Louisiana, 554 U.S. 407, 463-64, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)

26  (Alito, J., joined by Scalia and Thomas, JJ., dissenting) (implying that the death penalty

27  would be an appropriate punishment for child rape in cases where the victim was raped

28  multiple times, the rapes occurred over an extended period, or in cases involving

1  multiple victims).

2        Moreover, in this case, it is clear that the California legislature authorized the

3  punishment imposed on Petitioner under section 667.61(b), (c), and (e), and he has

4  pointed to no clearly established Supreme Court precedent that "forecloses that

5  legislative choice." See Ewing, 538 U.S. at 30 n.2; People v. Alvarado, 87 Cal. App. 4th

6  178, 200-01, 104 Cal. Rptr. 2d 624 (Cal. Ct. App. 2001) (section 667.61 "reflects the

7  Legislature's zero-tolerance toward the commission of sexual offenses against

8  particularly vulnerable victims."); see also Hutto v. Davis, 454 U.S. 370, 372, 102 S. Ct.

9  703, 70 L. Ed. 2d 556 (1982) (the United States Supreme Court "has never found a

10  sentence for a term of years within the limits authorized by statute to be, by itself, a cruel

11  and unusual punishment.").

12        Petitioner also argues that the punishment was cruel and unusual because there

13  insufficient physical evidence of his guilt. Lack of evidence is not a basis for finding cruel

14  and unusual punishment. However, the Fourteenth Amendment's Due Process Clause

15  guarantees that a criminal defendant may be convicted only by proof beyond a

16  reasonable doubt of every fact necessary to constitute the charged crime. Jackson v.

17  Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the

18  Jackson standard, "the relevant question is whether, after viewing the evidence in the

19  light most favorable to the prosecution, *any* rational trier of fact could have found the

20  essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319

21  (emphasis in original). Here, there was sufficient evidence based on the testimony of the

22  victims to convict Petitioner. The fact that no physical evidence was presented at trial

23  does not support a basis for finding that there was insufficient evidence of guilt.

24        Based upon the foregoing, Petitioner is not entitled to federal habeas relief for his

25  Eighth Amendment cruel and unusual punishment claim.

26        **C.**    <u>**Claim Three – Ineffective Assistance of Counsel**</u>

27        In his third claim, Petitioner claims that his trial counsel was ineffective for failing

28  to raise a claim that the court imposition of his sentence amounted to cruel and unusual

1  punishment. (Pet. at 26-29.)

2             1.    State Decision

3       Petitioner presented his ineffective assistance of counsel claim by way of a

4  petition for writ of habeas corpus to the California Supreme Court. (Lodged Doc. 12.)

5  The court summarily denied the petition. (Lodged Doc. 13.) In such cases, the Supreme

6  Court has instructed that the court must determine what "arguments or theories… could

7  have supported[] the state court's decision; then it must ask whether it is possible

8  fairminded jurists could disagree that those arguments or theories are inconsistent with

9  the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786.

10            2.    Law Applicable to Ineffective Assistance of Counsel Claims

11      The law governing ineffective assistance of counsel claims is clearly established

12 for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

13 Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas

14 corpus alleging ineffective assistance of counsel, the Court must consider two factors.

15 Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

16 v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's

17 performance was deficient, requiring a showing that counsel made errors so serious that

18 he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

19 Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell

20 below an objective standard of reasonableness, and must identify counsel's alleged acts

21 or omissions that were not the result of reasonable professional judgment considering

22 the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

23 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court

24 indulges a strong presumption that counsel's conduct falls within the wide range of

25 reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v.

26 Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

27      Second, the petitioner must demonstrate that "there is a reasonable probability

28 that, but for counsel's unprofessional errors, the result ... would have been different,"

1  <u>Strickland</u>, 466 U.S. at 694. Petitioner must show that counsel's errors were so

2  egregious as to deprive defendant of a fair trial, one whose result is reliable. <u>Id.</u> at 687.

3  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable

4  because of counsel's ineffectiveness. <u>Id.</u>; <u>Quintero-Barraza</u>, 78 F.3d at 1348; <u>United

5  States v. Palomba</u>, 31 F.3d 1456, 1461 (9th Cir. 1994).

6         A court need not determine whether counsel's performance was deficient before

7  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

8  <u>Strickland</u>, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any

9  deficiency that does not result in prejudice must necessarily fail. However, there are

10  certain instances which are legally presumed to result in prejudice, e.g., where there has

11  been an actual or constructive denial of the assistance of counsel or where the State has

12  interfered with counsel's assistance. <u>Id.</u> at 692; <u>United States v. Cronic</u>, 466 U.S., at 659,

13  and n.25 (1984).

14         As the Supreme Court reaffirmed recently in <u>Harrington v. Richter</u>, meeting the

15  standard for ineffective assistance of counsel in federal habeas is extremely difficult:

16           The pivotal question is whether the state court's application of the
    Strickland standard was unreasonable. This is different from asking
17   whether defense counsel's performance fell below <u>Strickland</u>'s standard.
    Were that the inquiry, the analysis would be no different than if, for
18   example, this Court were adjudicating a <u>Strickland</u> claim on direct review
    of a criminal conviction in a United States district court. Under AEDPA,
19   though, it is a necessary premise that the two questions are different. For
    purposes of § 2254(d)(1), "an unreasonable application of federal law is
20   different from an incorrect application of federal law." <u>Williams</u>, supra, at
    410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a
21   deference and latitude that are not in operation when the case involves
    review under the <u>Strickland</u> standard itself.
22
             A state court's determination that a claim lacks merit precludes
23   federal habeas relief so long as "fairminded jurists could disagree" on the
    correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541
24   U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this
    Court has explained, "[E]valuating whether a rule application was
25   unreasonable requires considering the rule's specificity. The more general
    the rule, the more leeway courts have in reaching outcomes in case-by-
26   case determinations." <u>Ibid.</u> "[I]t is not an unreasonable application of
    clearly established Federal law for a state court to decline to apply a
27   specific legal rule that has not been squarely established by this Court."
    <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed.
28   2d 251, 261 (2009) (internal quotation marks omitted).

1    Harrington v. Richter, 131 S. Ct. at 785-86.

2           "It bears repeating that even a strong case for relief does not mean the state

3    court's contrary conclusion was unreasonable." Id. at 786. "As amended by AEDPA, §

4    2254(d) stops short of imposing a complete bar on federal court relitigation of claims

5    already rejected in state proceedings." Id. "As a condition for obtaining habeas corpus

6    from a federal court, a state prisoner must show that the state court's ruling on the claim

7    being presented in federal court was so lacking in justification that there was an error

8    well understood and comprehended in existing law beyond any possibility for fairminded

9    disagreement." Id. at 786-87.

10          Accordingly, even if Petitioner presents a strong case of ineffective assistance of

11   counsel, this Court may only grant relief if no fairminded jurist could agree on the

12   correctness of the state court decision.

13                   3.    Analysis

14          Here, providing the state court decision with appropriate deference, fair-minded

15   jurists could disagree whether trial counsel fell below an objective standard of

16   reasonableness, or, alternatively, that Petitioner was prejudiced by counsel's conduct.

17          As described in the claim above, Petitioner's claim of cruel and unusual

18   punishment fails. Petitioner was convicted of 29 felony counts relating to the sexual

19   assault of his young daughters. While the Court was not lenient in its sentencing, it

20   would have been a reasonable tactical decision of trial counsel to not raise a claim of

21   cruel and unusual punishment based on the small likelihood of success of such a claim.

22   Furthermore, the Court has addressed, and in turn denied, the claims of cruel and

23   unusual punishment that he asserts counsel should have raised. Petitioner has not

24   shown that he was prejudiced by counsel's conduct.

25          In sum, the Court cannot find that counsel fell below an objective level of

26   performance, or that Petitioner was prejudiced by counsel's conduct. The state court

27   decision was not an unreasonable determination of federal law. Petitioner is not entitled

28   to habeas corpus relief.

**IV.   RECOMMENDATION**

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   June 30, 2014                    /s/ *Michael J. Seng*
                                         UNITED STATES MAGISTRATE JUDGE